# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Civil No. 12-1593 (MJD/FLN)

Daniel A. Peka,

        Plaintiff,

    v.                     **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,[1]
Commissioner of Social Security,

        Defendant

_____

Edward C. Olson, Esq., for Plaintiff

Gregory G. Brooker, Assistant United States Attorney, for Defendant

_____

Plaintiff Daniel A. Peka seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who found Plaintiff was not disabled from his alleged onset date of May 14, 2001 through the date last insured of June 30, 2009. The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g). The parties submitted cross-motions for summary judgment. [Doc. Nos. 15, 21.] For the reasons which follow, this Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

_____

[1]     Carolyn W. Colvin is substituted as the defendant pursuant to Fed. R. Civ. P. 25(d). Colvin became Acting Commissioner of Social Security on February 14, 2013. http://www.ssa.gov/pressoffice/factsheets/colvin.htm

# I.   INTRODUCTION

Plaintiff protectively filed an application for disability insurance benefits on January 5, 2009, alleging a disability onset date of May 14, 2001.  (Tr. 40, 150-51 [Doc. No. 8].)  His application was denied initially and upon reconsideration.  (Tr. 77-79, 87-89.)  He requested a hearing before an ALJ, and the hearing was held on January 25, 2011.  (Tr. 90-91, 50-72.)  The ALJ denied Plaintiff's application for benefits on March 14, 2011.  (Tr. 37-49.)  The Appeals Council then denied Plaintiff's request for review.  (Tr. 1-5.)  Plaintiff filed a complaint for judicial review in this Court on July 2, 2012.  The matter is now before this Court on cross-motions for summary judgment.

# II.   STATEMENT OF FACTS

## A.   Employment History

Plaintiff was most recently employed part-time as a manager at a restaurant from January 2004 through June 2005.  (Tr. 200, 299.)  Prior to that, Plaintiff worked as a caretaker at Fort Snelling National Cemetery from January 1987 through May 2001.  (*Id.*)  He left Fort Snelling after sustaining an elbow injury.  (Tr. 770, 777, 817.)

## B.   Medical Records Before Plaintiff's Last Insured Date

Plaintiff sustained a work related injury to his elbow in July 2000, when he hit his left elbow getting off a tractor.  (Tr. 770, 777, 817.)  Based on findings of tendinitis, Dr. John Kearns performed surgical debridement of Plaintiff's elbows in May and June 2001.  (Tr. 818, 770, 821, 823.)  On January 28, 2002, Dr. Kearns gave Plaintiff permanent work restrictions of sedentary work with no repetitive use of his arms, and no lifting over ten pounds.  (Tr. 769-70.)

Plaintiff had an EMG on February 8, 2002, to evaluate numbness and tingling in his hands. (Tr. 782.) The EMG showed mild carpal tunnel syndrome on the right, moderately advanced carpal tunnel syndrome and mild Guyon's canal entrapment on the left. (*Id.*) On June 14, 2002, Dr. Douglas Drake was concerned that Plaintiff had a lot of complaints that were not backed up by physical findings, and he was reluctant to offer surgery but would await the findings of a neurological evaluation. (Tr. 800.)

Plaintiff saw Dr. Vanda Niemi at Noran Neurological Clinic in July 2002, and complained of neck pain radiating into his right arm, starting shortly after his right arm surgery in May 2001. (Tr. 775.) An MRI of his cervical spine showed a small disc herniation at C5-6. (*Id.*) There was no evidence of nerve root impingement. (*Id.*) Dr. Niemi recommended physical therapy, anti-inflammatories, and muscle relaxants. (Tr. 775.) He would need to do conditioning exercises for his neck and avoid activities he was not conditioned to perform. (Tr. 775-76.) On December 14, 2002, Dr. Kearns noted that Plaintiff's elbow range of motion had returned to normal but he continued to experience significant elbow pain that prevented him from returning to work. (Tr. 789.) Dr. Kearns believed Plaintiff was disabled. (*Id.*)

Approximately eleven months later, on October 29, 2003, Plaintiff told Dr. Kearns his elbow and hand symptoms were the same. (Tr. 787.) Plaintiff also had longstanding neck pain. (*Id.*) Dr. Kearns diagnosed cervical disk disease, tendinitis in the elbows, and carpal tunnel syndrome. (*Id.*) He continued Plaintiff's work restrictions. (Tr. 788.)

Plaintiff had a neurological consultation with Dr. Niemi on November 13, 2003, to evaluate his complaints of low back and leg pain. (Tr. 334-35.) If he had to stand more than fifteen minutes, his legs felt weak and numb. (Tr. 334.) Dr. Niemi noted that Plaintiff was on Advil and Vicodin.

(*Id.*)  Plaintiff was approved for medical disability retirement but was still looking for work within his restrictions, and he was applying for Social Security disability.  (*Id.*)  On examination, Plaintiff had somewhat decreased range of motion in his neck and good range of motion at his waist.  (Tr. 334.)  All of the following were normal on examination: cranial nerves, muscle tone and strength in upper and lower extremities, sensation in upper and lower extremities, reflexes in upper and lower extremities, coordination, station and gait.  (Tr. 334-35.)  Dr. Niemi recommended an MRI because Plaintiff most likely had degenerative changes in the low back.  (Tr. 335.)

Dr. Niemi saw Plaintiff in follow up on December 1, 2003.  (Tr. 332-33.)  Plaintiff complained of neck pain extending into his right arm and right arm numbness, numbness in the fingers of his left hand, and low back pain extending into his right leg and foot.  (Tr. 332.)  Plaintiff said he had neck and back pain for years while working as a caretaker at a cemetery, and he attributed his pain to the heavy nature of the work.  (*Id.*)  Dr. Niemi opined that Plaintiff's recent lumbar MRI was consistent with mild diffuse lower thoracic and lumbar spondylosis,[2] and minimal posterior disc bulge at L2-3 on the left.  (Tr. 330-32.)  There was no evidence of nerve root impingement.  (Tr. 332.)  Dr. Niemi stated, "[i]t seems that there is no question that his neck and back pain have resulted from many years of heavy work at the cemetery."  (Tr. 332-33.)  She did not impose any additional work restrictions. (Tr. 333.)

Plaintiff underwent nerve conduction studies of his upper extremities again on April 13, 2004. (Tr. 342.)  The results were consistent with carpal tunnel syndrome, mild to moderate on the left and mild on the right.  (Tr. 343.)  The examination was otherwise normal.  (*Id.*)

---

[2]    The term spondylosis is often applied nonspecifically to any lesion of the spine of a degenerative nature.  *Stedman's Medical Dictionary* ("*Stedman's*") 1678 (27th ed. 2000).

On June 8, 2004, Dr. Kearns gave Plaintiff permanent sedentary work restrictions, four hours per day, with no repetitive use of the upper extremities, no lifting and carrying over ten pounds, with frequent change of position. (Tr. 344.) The next week, Plaintiff saw Physician Assistant Dane Durdall at Health Partners Central Minnesota Clinics to establish care. (Tr. 348-49.) Durdall noted that Plaintiff worked at a bar and grill as the morning manager, four hours per day. (Tr. 348.) Plaintiff said he enjoyed fishing and boating and most outdoor activities. (*Id.*) Plaintiff took Vicodin on a limited, occasional basis for pain. (*Id.*) On examination, Plaintiff's straight leg raise tests were positive for symptoms of sciatica to the right leg. (Tr. 349.) He also had some loss of range of motion to the right hip but good range of motion of the left hip. (*Id.*) His back was straight with no discernible spasm. (*Id.*) X-rays of Plaintiff's right hip showed no fractures, mild degenerative changes of the hip joint, and mild right sacroiliac degenerative changes. (Tr. 357.)

Three years later, on July 19, 2007, Plaintiff complained of limitations using his upper extremities, reporting that he worked four hours per day in "more or less light duty type of work." (Tr. 362.)[3] On examination, Plaintiff had normal range of motion of his shoulders, full extension of his elbows with normal pronation and supination, tenderness but not warmth or erythema of the epicondyle, normal finger range of motion bilaterally, grip strength twenty pounds on the right and forty pounds on the left. (*Id.*) Plaintiff next saw Dr. Kearns on October 12, 2007, and his recent EMG findings were consistent with moderate carpal tunnel syndrome on the left, mild ulnar neuropathy at the elbow on the left, no significant abnormalities of the right upper extremity, and no evidence of cervical radiculopathy. (Tr. 361, 363-64) Although there were no findings on the right upper

---

[3]  Contrary to this report, Plaintiff indicated in his work history to the SSA that he last worked part-time from January 2004 through June 2005. (Tr. 299.)

extremity, Dr. Kearns noted Plaintiff complained of bilateral symptoms. (Tr. 361.) Dr. Kearns suggested a consultation for left elbow and carpal tunnel release surgery. (*Id.*)

A little more than a year later, on January 5, 2009, Plaintiff saw Dr. Jonathon Nelson at Health Partners Central Minnesota Clinics to evaluate knee, hip, and back pain. (Tr. 350-52.) Plaintiff reported years of back pain radiating down his legs. (Tr. 350.) His knees sometimes gave out and had been hurting for at least a year. (*Id.*) Naprosyn and aspirin were not effective for his pain. (*Id.*) On examination, Dr. Nelson noted Plaintiff had moderately reduced flexion and lateral motion of the spine with lower paraspinal muscle tenderness. (Tr. 351.) Plaintiff had patellar tenderness but no knee swelling, full range of motion in the knees, pain in the right hip, normal gait and obesity. (*Id.*) X-rays of Plaintiff's knees indicated mild bilateral medial compartment narrowing without chondrocalcinosis[4] or loose bodies. (Tr. 353.) X-rays of his lumbar spine showed small osteophytic spurring at L-4 with decreased lordosis.[5] (Tr. 355.) Dr. Nelson recommended treatment with physical therapy. (Tr. 352.)

Plaintiff saw Dr. Kearns on January 8, 2009 for evaluation and paperwork completion for his social security disability claim. (Tr. 360.) Dr. Kearns noted Plaintiff had a long history of elbow pain treated by surgery, and history of bilateral carpal tunnel syndrome. (*Id.*) Plaintiff reported he was unable to work and only worked intermittently over the past years. (*Id.*) He complained of pain, numbness and weakness in his hands, causing him to drop things. (*Id.*) His pain was moderate and getting worse. (*Id.*) Dr. Kearns referred Plaintiff for a functional capacity assessment. (*Id.*)[6]

---

[4]     Chondrocalcinosis is the calcification of cartilage. *Stedman's* at 341.

[5]     Lordosis refers to the convex curvature of a vertebral column. *Stedman's* at 1032.

[6]     There is no functional capacity assessment in the administrative record.

Plaintiff saw Dr. Kearns again on January 19, 2009, for knee discomfort. (Tr. 415.) His knees frequently gave out, and he had fallen on several occasions. (*Id.*) Prolonged sitting and squatting were painful to him. (*Id.*) Climbing stairs, getting up from sitting, and pivoting aggravated his symptoms. (*Id.*) He could not kneel comfortably. (*Id.*) On examination, Plaintiff had full range of motion of his knee, and there was no crepitation or laxity. (*Id.*) His muscle tone and neurovascular status were intact. (*Id.*) Dr. Kearns diagnosed malalignment with subluxation and abnormal tilt bilaterally, extensor mechanism overuse syndrome, and chondromalacia[7] of the patellofemoral joints. (Tr. 416.) Dr. Kearns recommended knee braces, glucosamine, chondroitin sulfate, and physical therapy. (*Id.*)

On March 9, 2009, Dr. James Jackson reviewed Plaintiff's social security disability file for an initial determination on his disability application. (Tr. 379-81.) Dr. Jackson completed a Physical Residual Functional Capacity ("RFC") Assessment regarding Plaintiff, and opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand/and or walk six hours in an eight-hour workday, sit for six hours in an eight-hour workday, with unlimited ability to push and pull including hand and foot controls. (Tr. 382-83.) Plaintiff could occasionally climb ladders, ropes or scaffolds, ramps or stairs, stoop and crouch. (Tr. 384.) Plaintiff could frequently balance, kneel and crawl. (*Id.*) He should avoid concentrated exposure to hazards due to impaired sensation in his feet. (Tr. 386.)

Plaintiff underwent a new patient evaluation at Interventional Pain & Physical Medicine Clinic with Dr. Thomas Kowalkowski on April 13, 2009. (Tr. 393.) He had long term low back, neck and knee pain. (*Id.*) His other symptoms included fatigue, headaches, muscle spasms, numbness, poor

---

[7] Chondromalacia is the softening of any cartilage. *Stedman's* at 341.

balance, stiffness, tingling, weakness, and weight gain. (Tr. 394.) He was taking pregabalin, Ambien and ibuprofen. (*Id.*) Pain interfered with Plaintiff's sleep. (Tr. 396.) He was leading a sedentary lifestyle. (*Id.*) On examination, Plaintiff had normal muscle tone with no atrophy, swelling or elasticity. (Tr. 397.) He had decreased rotation of his hips, bilateral knee tenderness, neck and lower lumbar spine tenderness. (*Id.*) His feet and right thigh were hypersensitive, and he had difficulty with deep knee squat. (*Id.*) Dr. Kowalkowski recommended lumbar and sacral medial branch blocks, followed by a rehabilitation program, and knee injections followed by a strengthening program. (Tr. 398-99.)

Plaintiff was evaluated for physical therapy the next week, and reported that even with knee braces on, his right knee gave out 3-4 times a day, and his left knee gave out 1-2 times a day. (Tr. 400.) His knee braces did not fit properly. (Tr. 402.) Plaintiff's lumbar medial branch blocks indicated concordant pain at L3-4, L4-5, and L5-S1. (Tr. 407.) On April 22, 2009, Plaintiff's physical therapist, Allen Zetterlund, noted that Plaintiff was very weak and lacked range of motion of the lumbar spine. (Tr. 424.) At his next appointment later that week, Plaintiff reported walking ½ mile every night, and he had to wear knee braces or his knees gave out. (Tr. 425.) Two days later, Plaintiff reported falling over on his evening walk and having trouble getting up. (Tr. 430.) Zetterlund ordered Plaintiff a cane. (*Id.*) On April 24, 2009, Plaintiff requested that Dr. Kearns delete his work restriction for sedentary work. (Tr. 413.) Dr. Kearns did so and gave Plaintiff a new set of work restrictions. (Tr. 413-14.)

On May 27, 2009, Plaintiff said that physical therapy had been moderately beneficial. (Tr. 440.) He was working at keeping up a cemetery near his home, but his knees hurt after working. (Tr.

441.) He had also been walking up to two miles a day but gave it up because his knees gave out. (*Id.*) He would continue physical therapy to strengthen his knees because he wanted to remain active. (*Id.*)

On June 2, 2009, Plaintiff could not do many of the strengthening activities for his knees due to pain. (Tr. 445.) Tramadol gave him 20% relief, Advil was not effective, and Ambien helped him sleep for four hours at night. (Tr. 453.) Plaintiff denied medication side effects. (*Id.*) On June 16, 2009, Plaintiff reported that his right knee continued to give out. (Tr. 458.) At his next session, Plaintiff discontinued all therapy for his knees because it was not helping, but he continued therapy for his lumbar and cervical spine. (Tr. 475-76.)

## C. Medical Records After Plaintiff's Date Last Insured

On July 17, 2009, Plaintiff reported that he discontinued Lyrica because it did not help, and he otherwise denied medication side effects. (Tr. 484.) Dr. Kowalkowski prescribed Nortriptyline for sleep and Voltaren gel for knee pain. (Tr. 486.) Plaintiff later reported improvement in his sleep with Nortriptyline. (Tr. 506.)

On July 25, 2009, Dr. M. Bacalla reviewed Plaintiff's social security disability file at the request of the SSA, and completed a Physical Residual Functional Capacity Assessment form regarding Plaintiff. (Tr. 460-67.) Dr. Bacalla opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and/or walk two hours in an eight-hour day, sit for six hours in an eight-hour day, unlimited push and pull and operate hand or foot controls, never climb ladders, ropes or scaffolds, and occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl. (Tr. 461-62.) Plaintiff was also limited to occasional work above the shoulders bilaterally, and frequent handling with both hands. (Tr. 463.) He should avoid concentrated exposure to vibration. (Tr. 464.) Dr. Bacalla noted that while Plaintiff reported difficulty walking, some of the

records in the file indicated normal gait. (Tr. 465.) Dr. Carol Segl reviewed Plaintiff's social security disability file upon reconsideration on July 28, 2009, and affirmed Dr. Bacalla's opinion. (Tr. 472-74.)    In September 2009, Plaintiff began a series of hip joint injections. (Tr. 489.) The next month, Plaintiff reported increased pain in his feet and an electrical type feeling in his low back. (Tr. 525.) Overall, he thought physical therapy was helpful. (*Id.*) On October 29, 2009, Plaintiff's sore knees were his biggest problem. (Tr. 533.) Dr. Kowalkowski referred Plaintiff to Dr. Joseph Nessler at St. Cloud Orthopedics Associates for evaluation of his knees. (Tr. 497.) Plaintiff's knees had reasonable range of motion, no instability, and no effusion. (*Id.*) He had limited range of motion of his hips, and he was neurovascularly intact. (*Id.*) X-rays of Plaintiff's knees did not show advanced arthritic changes but x-rays of his hips and pelvis showed moderately advanced arthritis. (*Id.*) Dr. Nessler recommended hip corticosteroid injections. (*Id.*)

On December 28, 2009, Plaintiff saw Physician Assistant Erik Hanson at St. Cloud Orthopedic Associates for follow up. (Tr. 496.) Plaintiff was feeling much better and walking without his cane. (*Id.*) Plaintiff did not want to have a hip replacement before his scheduled trip to Mexico. (*Id.*) He continued to have pain with range of motion of his hips. (*Id.*) His hip x-rays showed some inferior medial narrowing and osteophytes. (*Id.*) Due to his response to the injections, he was a candidate for hip replacement. (*Id.*)

On February 2, 2010, Plaintiff's physical therapist noted that Plaintiff had not shown improvement because he was not consistent in attending sessions for insurance and personal reasons. (Tr. 564.) Two weeks later, Plaintiff told his physical therapist that his vacation to Mexico was later that week. (Tr. 722.) His back was painful with prolonged sitting, but his knees were healing. (*Id.*)

On March 30, 2010, Dr. Leslie Lofgren ordered a stress test to evaluate Plaintiff's symptom of shortness of breath, which he noticed while fishing. (Tr. 617-18.) If the test was normal, he would be cleared for hip surgery. (Tr. 618.) Plaintiff had left hip replacement on April 13, 2010. (Tr. 576-77.) Plaintiff saw Dr. Lofgren again on May 17, 2010, and she was concerned that Plaintiff was taking significant amounts of tramadol. (Tr. 602.) She recommended a pain clinic and physical therapy and/or injections. (Tr. 602-03.) She ordered x-rays of Plaintiff's lumbar spine, which showed mild progression of degenerative changes in the lumbar spine, Scheuermann's disease,[8] and predominantly degenerative disc and degenerative arthrosis at L4-5 and L5-S1. (Tr. 607.)

Plaintiff was ready to resume physical therapy in June 2010, after his left hip replacement. (Tr. 733.) Plaintiff's gait had improved, and his low back pain decreased when he was given a heel lift. (Tr. 737.) A month later, Plaintiff complained of muscle spasms in his back. (Tr. 740.) On July 5, 2010, his lumbar MRI showed mild to moderate changes, predominantly at the facet joints; annular tear at L3-L4 with an associated disc bulge but no neural impingement at any level; epidural lipomatosis at L5-S1 with narrowing of the thecal sac; no significant central canal narrowing; no significant neural foraminal narrowing; and inflammatory L4-L5 facet joint arthrosis. (Tr. 608-09.)

On September 9, 2010, most of Plaintiff's pain was in the left lumbar area. (Tr. 687.) He could only walk a block due to hip pain. (*Id.*) He tried not to climb stairs. (*Id.*) Plaintiff's physical therapist noted that Plaintiff was deconditioned and posture was a huge issue in his pain. (*Id.*) Plaintiff had right hip replacement on September 23, 2010. (Tr. 757.)

When Plaintiff saw Physician Assistant Hanson on October 25, 2010, Plaintiff was "getting along really quite well." (Tr. 753.) He continued to use a cane and continued to have low back pain

---

[8]     Scheuermann's disease is avascular necrosis of vertebral bodies, most commonly seen without kyphosis or pain and with few vertebral bodies involved. *Stedman's* at 520.

that made it difficult for him to stand for any length of time. (*Id.*) Plaintiff was evaluated at St. Cloud

Orthopedics on November 8, 2010. (Tr. 749-51.) His neuro examination was largely normal, but his

gait was antalgic and significant atrophy was noted throughout. (Tr. 750.) Based on the evaluation

and Plaintiff's imaging studies from July 5, 2010, Dr. Joel Shobe recommended a L3-4 decompressive

laminectomy, and the surgery was performed on December 22, 2010. (Tr. 749-50, 765-66.)

On April 28, 2011, Dr. Kearns gave Plaintiff permanent work restrictions of sedentary work,

four hours per day, no repetitive use of the upper extremities, no lifting or carrying over ten pounds,

and frequent change of position. (Tr. 853.) Six months later, Dr. Kearns explained that he had given

Plaintiff permanent sedentary work restrictions in June 2004 but in response to Plaintiff's request, he

deleted the sedentary restriction in April 2009, because Plaintiff had been told it would prevent him

from getting social security disability. (Tr. 858.) Dr. Kearns stated that he believed the sedentary

restrictions he imposed in June 2004 were appropriate based on Plaintiff's upper extremities and

cervical condition. (*Id.*)

### D.     Administrative Hearing

Plaintiff testified at the hearing on January 25, 2011. (Tr. 50-72.) Plaintiff's counsel offered

to amend the disability onset date to August 2008 but the ALJ did not do so. (Tr. 55.) Plaintiff had

a tenth grade education but later obtained a GED after going into military service. (Tr. 58-59.) He

had never been married and lived by himself at the time of the hearing. (Tr. 54.) Plaintiff collected

worker's compensation payments in the amount of $1,642.00 per month. (Tr. 56.) He saw doctors

with respect to his worker's compensation claim almost every year. (Tr. 57.) The ALJ asked Plaintiff

why he asked a physician to delete a sedentary work restriction from a medical record. (Tr. 58.)

Plaintiff said he was just doing what he was asked to do. (*Id.*) Plaintiff had worked with two QRCs

to look for other work. (Tr. 59.) He was in physical therapy the last two years for his back, neck and knees. (Tr. 59-60.) Plaintiff had three surgeries in the last nine months, back surgery and hip replacement surgeries. (Tr. 61.) He also went to Mexico with a group of friends and spent his time laying on the beach. (Tr. 55.)

Plaintiff and his mother lived in the same building, so she did his shopping and cooking for him. (Tr. 63.) For pain and insomnia, Plaintiff took tramadol, Nortriptyline, and Ambien. (Tr. 62-63.) Plaintiff's medications made him tired, and he took naps twice a day. (Tr. 70-71.) Plaintiff could lift and carry a maximum of ten pounds, but not very far. (*Id.*) He could sit for a half hour before he had to get up. (*Id.*) He could only stand in one spot for a few minutes and could walk about a block before he needed to rest. (Tr. 63-64.) Plaintiff thought his knees would be better after his hip replacements but he still had trouble with his right knee going out, and he continued to wear braces. (*Id.*)

Wayne Onken testified at the hearing as a vocational expert. (Tr. 65, 141.) The ALJ asked whether Plaintiff would be precluded from performing his past work if he was limited to lifting twenty pounds occasionally, ten pounds frequently, and a maximum of two hours per workday on his feet. (Tr. 65-66.) Onken testified that he would be precluded from his past work. (Tr. 66.) Then, the ALJ told Onken to assume a younger individual with a high school education and no difficulties with communication, who would be limited to two hours on his feet, no limitation in pushing or pulling or hand and foot controls, could not climb ropes, ladders or scaffolds, frequently handle, should avoid concentrated exposure to vibration due to carpal tunnel issues, and could do the following occasionally: balance, stoop, kneel, crouch, crawl, overhead work above the shoulders bilaterally. (*Id.*)

Onken testified such a person could perform the job of gate guard,[9] and counter clerk.[10] The ALJ then asked Onken to assume the person was limited to sedentary work and all other restrictions were the same. (Tr. 68.) Onken testified that most gate guard jobs were "pretty sedentary." (*Id.*) He also testified that such a person could perform the jobs of surveillance system monitor,[11] and telemarketer.[12] (Tr. 69.)

### E. ALJ's Decision

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2009.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 14, 2001 through his date last insured of June 30, 2009. (20 CFR 404.1571 *et seq.*)

3. Through the date last insured, the claimant has the following severe impairments: degenerative disc disease, osteoarthritis, status post hip replacement (20 CFR 404.1520(c)).
   . . .

4. Through the date last insured, the claimant does not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).
   . . .

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant is limited

---

[9]     Dictionary of Occupational Titles ("DOT") Code 372.667-030.

[10]     DOT Code 249.366-010.

[11]     DOT Code 379.367-010.

[12]     DOT Code 299.357-014.

to work with no ropes, ladders and scaffolding, occasional balancing, kneeling, crouching, crawling, stooping, occasional overhead work above the shoulder bilateral and frequent handling with both hands. The claimant is to avoid concentrated exposure to vibrations.

. . .

6.   Through the date last insured, the claimant was unable to perform any past relevant work. (20 CFR 404.1565).

. . .

7.   The claimant was born on July 11, 1960 and was 48 years old, which is defined as a younger individual age 45-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from May 14, 2001, the alleged onset date, through June 30, 2009, the date last insured (20 CFR 404.1520(g)).

(Tr. 42-49.)

## III.   CONCLUSIONS OF LAW

### A.   Standard of Review

Disability is defined as "the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 20

C.F.R. § 404.1505(a). Judicial review of the final decision of the Commissioner is restricted to a

determination of whether substantial evidence on the record as a whole supports the decision. 42

U.S.C. 405(g); *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007). "Substantial evidence is

relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's

conclusion." *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (quoting *Young v. Apfel*, 221 F.3d

1065, 1068 (8th Cir. 2000)). In determining whether evidence is substantial, the court must consider

both evidence that supports and evidence that detracts from the Commissioner's decision. *Moore ex*

*rel Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005). If it is possible to draw two inconsistent

positions from the evidence, and one of those positions represents the Commissioner's findings, the

court must affirm the Commissioner's decision. *Vandenboom v. Barnhart*, 421 F.3d 745, 749 (8th Cir.

2005).

### B. Discussion

Plaintiff raises three arguments in support of his motion for summary judgment. First, Plaintiff

contends the ALJ erred by finding Plaintiff did not have a severe impairment of his upper extremities.

Second, Plaintiff complains about the ALJ's RFC determination. In evaluating his RFC, Plaintiff

contends the ALJ should have granted more weight to Dr. Kearn's medical opinion or contacted Dr.

Kearns about inconsistencies in the record before discounting his opinion. Moreover, Plaintiff argues

that in evaluating his RFC, the ALJ substituted his own inferences about Plaintiff's functional ability

for the opinions of the medical providers. Third, Plaintiff contends the ALJ erred in relying on the

VE's testimony because it was based on a hypothetical question that did not accurately describe

Plaintiff's residual functional capacity.

### 1. Severe Impairments

Plaintiff contends he has a severe impairment of his upper extremities proven by his treatment for elbow pain beginning in April 2001, with objective evidence of abnormalities shown on EMG, and his treating physician's opinion that he could not use his upper extremities for repetitive activities. The Commissioner argues it is inconsequential that the ALJ did not find upper extremity pain to be a severe impairment because the ALJ considered Plaintiff's allegations of limitations in his arms and hands when he evaluated Plaintiff's RFC.

Step two of the disability evaluation process requires a finding of whether the claimant suffers from a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). An impairment or combination of impairments is nonsevere when it does not significantly limit the individual's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). Basic work activities include physical functions such as lifting, pushing, pulling, reaching, carrying or handling. *Id.* § 404.1521(b)(1). The Supreme Court has described the severity standard at step two of the disability evaluation as a "de minimus standard," and only "those claimants with slight abnormalities that do not significantly limit any basic work activity can be denied benefits [at step two.]" *Hudson v. Bowen*, 870 F.2d 1392, 1395-96 (8th Cir. 1989) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)). If a claimant has more than one impairment, the SSA "will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe" . . . when we assess your residual functional capacity." 20 C.F.R. § 404.1545(a)(2).

The ALJ did not explain why he found that Plaintiff's elbow and wrist problems were nonsevere. (Tr. 42.) Nonetheless, the ALJ restricted Plaintiff's ability to lift and carry and found that Plaintiff was limited to occasional above the shoulder work, and frequent, as opposed to constant, handling. (Tr. 43-44.) These are significant limitations of basic work activities. Thus, the ALJ

accommodated severe impairments of Plaintiff's arms and hands, although he did not label the impairments severe. Plaintiff bears the burden to show the ALJ's failure to identify these impairments as severe was not harmless. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (the claimant "must provide some indication that the ALJ would have decided differently if the error had not occurred.") Because the ALJ did not end the disability evaluation at step two and considered Plaintiff's arm and hand impairments in evaluating Plaintiff's RFC, to succeed, Plaintiff must establish ALJ error at the subsequent steps of the disability evaluation process.

### 2. Residual Functional Capacity

### a. Medical Opinions

Plaintiff contends the ALJ erred by not granting any weight to his treating physician's opinion. Plaintiff asserts that instead of rejecting Dr. Kearns' RFC opinion, the ALJ should have contacted Dr. Kearns to resolve any inconsistencies between his opinion and the medical records. Plaintiff contends Dr. Kearns' opinion is entitled to deference based on his unique perspective of the medical evidence that is not shared by those with less knowledge of Plaintiff. However, the Commissioner asserts Dr. Kearns' opinion was not entitled to greater weight because it was not supported by objective evidence and was inconsistent with other evidence in the record. Furthermore, the Commissioner argues Dr. Kearns' opinion was based on Plaintiff's subjective complaints, which were not entirely credible. The Commissioner also asserts Dr. Kearns specifically tailored his opinion to assist Plaintiff in obtaining disability benefits. Because the records do not contain an undeveloped issue, the Commissioner contends the ALJ was not required to contact Dr. Kearns for clarification.

An ALJ should give a treating physician's opinion controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir.

2000) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ can discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). If the ALJ does not give the treating physician's opinion controlling weight, she should consider the following factors in weighing the medical opinions: 1) type of relationship with physician; 2) supportability of the opinion; 3) consistency of the opinion with the record as a whole; 4) specialization; and 5) any factors brought to the ALJ's attention. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Id.* (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). ALJs must seek additional evidence or clarification from a medical source when a report from that source contains a conflict or ambiguity that needs to be resolved. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). However, this duty arises only when the record does not provide an adequate basis to determine the merits of the disability claim. *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004). In other words, an ALJ should contact a treating physician if a critical issue is undeveloped. *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010).

Dr. Kearns limited Plaintiff to four hours sedentary work, no repetitive use of his hands and frequent change of position but the ALJ allowed full-time sedentary work with occasional above the shoulders work bilaterally, frequent handling, and certain postures limited to occasional but no requirement for frequent change of position. The ALJ rejected Dr. Kearns' opinion for the following reasons. First, the ALJ noted that Dr. Kearns completed a work restriction form for Plaintiff in 2004 but later removed the sedentary restriction at Plaintiff's request, based on instructions Plaintiff had from an insurance provider. (Tr. 45-46.) The ALJ also stated that he did not give Dr. Kearns' opinion

any weight because it was not supported by objective evidence or by Dr. Kearns' treatment notes. (Tr. 46.) In this regard, the ALJ noted Plaintiff was treated conservatively for cervical and lumbar spondylosis and carpal tunnel syndrome. (*Id.*) Although Plaintiff had decreased cervical range of motion in December 2008, he had normal reflexes and gait. (*Id.*) In January 2009, Plaintiff had few findings associated with his lumbar spine and knee pain. (*Id.*) Although Plaintiff had surgeries after 2009, the ALJ concluded his limitations were not severe enough to preclude work prior to Plaintiff's date last insured. (*Id.*)

The ALJ also cited evidence that Plaintiff improved with physical therapy and could walk longer distances using a cane. (*Id.*) Plaintiff was able to maintain a cemetery near his home and travel to Mexico. (*Id.*) The ALJ discounted Plaintiff's allegation of work-related injury because he did not receive continuous treatment over the years. (Tr. 47.) The ALJ also concluded that Plaintiff's willingness to amend his onset date to August 2008 was an acknowledgment that there was insufficient evidence to establish disability "for the entire period prior to the claimant's date last insured." (*Id.*)[13]

There is little in the record to suggest disability over the three-year period of June 2004 through July 2007, because Plaintiff did not seek treatment or evaluation. Although there are objective findings in the record concerning Plaintiff's elbows, wrists, neck, back and knees, all of the findings are of fairly minor conditions such as tendinitis, mild to moderate carpal tunnel syndrome, cervical and lumbar osteoarthritis without nerve impingement or severe disc herniations, and very minor knee abnormalities. Although Dr. Kearns' opined that Plaintiff had permanent limitations against using his hands repetitively, Plaintiff did not seek any treatment for pain between January 2003 and September

[13]     This is not accurate because Plaintiff's date last insured is June 30, 2009, leaving open the possibility he could establish disability onset between August 2008 and June 30, 2009, with evidence of disabling impairments expected to last at least twelve months.

2003, July 2004 through June 2007, or from November 2007 through December 2008. Objective findings of moderate arthritis in Plaintiff's hips were not found until November 2009, well after his date last insured of June 30, 2009. Furthermore, Plaintiff deferred his hip surgeries until after his trip to Mexico in February 2010, suggesting his hip pain was not severe enough at that time to interfere with traveling.        The ALJ provided proper reasons to reject Dr. Kearns' RFC opinion. Plaintiff's failure to seek treatment for several extended periods of time suggests his medical problems were not serious. *See Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (failure to seek treatment may be inconsistent with disability). Dr. Kearns offered inconsistent opinions of Plaintiff's RFC when he deleted the sedentary restriction in favor of light duty upon Plaintiff's request. *See Hogan,* 239 F.3d at 961 (8th Cir. 2001) (ALJ may discount treating physician opinion where physician offered inconsistent opinions). Also, the  objective findings in the record did support the degree of work limitations described by Dr. Kearns. *See Pearsall v. Massanari*, 274 F.3d 1211, 1218-19 (8th Cir. 2001) (affirming where ALJ discounted treating physician opinion because it was not supported by objective testing). Furthermore, Plaintiff has not identified any critical undeveloped issue that could be resolved by contacting Dr. Kearns. *See Goff*, 421 F.3d at 791 (8th Cir. 2005) (ALJ may discount opinion without seeking clarification if opinion was inconsistent with other substantial evidence.)

### b.        Evidence Supporting ALJ's RFC Determination

Plaintiff contends the ALJ improperly drew his own inferences about Plaintiff's functional ability from the medical reports and substituted his opinion for that of Dr. Kearns. Thus, Plaintiff asserts the ALJ's opinion is not based on substantial evidence in the record as a whole. The Commissioner contends the ALJ relied primarily on the physical RFC assessments of state agency consulting physicians, Drs. Jackson and Bacalla.

The ALJ's RFC opinion was nearly identical to Dr. Bacalla's opinion with the exception that

the ALJ gave Plaintiff greater lifting restrictions, ten pound maximum rather than twenty pounds. (Tr. 44.) The ALJ concluded that Dr. Bacalla's opinion was "generally consistent with the weight of the evidence as it is before the Commissioner at the hearing level." Although a nontreating physician's opinion alone does not constitute substantial evidence to support an ALJ's RFC determination, the ALJ relied on all of the medical evidence in the record as a whole and the credibility factors in arriving at Plaintiff's RFC. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (affirming where ALJ did not rely solely on opinion of consulting physician because ALJ conducted independent review of the medical evidence.)

The ALJ recognized that Plaintiff had a longstanding history of carpal tunnel syndrome, and that he had bilateral epicondylectomy to treat numbness, tingling and pain in his arms and hands in 2001. (Tr. 44-45.) The ALJ also noted that Plaintiff had objective findings of carpal tunnel syndrome in 2004, bilateral epicondylitis, chronic ulnar nerve symptoms and chronic carpal tunnel syndrome in 2007. (Tr. 45.) Although these findings support some limitation from pain, the issue is the severity of the pain and limitation.

In December 2002, Dr. Kearns acknowledged that his disability opinion was based on Plaintiff's subjective pain complaints because objectively, Plaintiff's elbows had improved. (Tr. 789.) The ALJ did not fully credit Plaintiff's subjective complaints, partly because he had only conservative treatment for carpal tunnel syndrome. (Tr. 46.) Additionally, in 2007 Plaintiff's EMG supported moderate carpal tunnel syndrome on the left and mild ulnar neuropathy on the left, but Plaintiff claimed his pain was in both arms, although there were no objective findings in his right arm. (Tr. 45.) Dr. Kearns referred Plaintiff for consultation on left arm surgery but it appears that Plaintiff never followed through on this referral.

Finally, the ALJ discounted Plaintiff's credibility because 1) Plaintiff maintained a cemetery;

2) Plaintiff told his physical therapist he walked ½ mile every night using a knee brace; 3) Plaintiff's neck and back improved with therapy; 4) Plaintiff was able to drive himself 25 miles to the hearing; and 5) Plaintiff went to Mexico on vacation in February 2010. (Tr. 46.) The ALJ also considered Plaintiff's work history, noting Plaintiff was receiving a worker's compensation benefit because it was greater than medical retirement but Plaintiff worked part-time after the benefit was awarded. (Tr. 47.) Plaintiff did not quit his part-time job due to disability, the job ended because the business closed. (*Id.*) Based on Plaintiff's worker's compensation benefit and part-time work, the ALJ questioned whether Plaintiff's unemployment from the alleged onset date through the date last insured truly arose from an inability to work, implying that Plaintiff could afford not to work full-time. (*Id.*)

Because the objective findings are minor but Plaintiff alleges disabling pain and limitations, Plaintiff's credibility is an important issue. An ALJ may rely on the lack of objective medical evidence supporting a Plaintiff's subjective complaints as one factor but not as the sole basis for rejecting a Plaintiff's credibility. *Halvorsen v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010). Plaintiff alleges inability to use his arms repetitively or to sit, stand or walk for any significant length of time. Plaintiff's conservative treatment followed by long periods without treatment for elbow and wrist pain belie his credibility. *See Robinson v. Sullivan*, 956 F.2d 836, 840 (8th Cir. 1992) (affirming ALJ's credibility determination where Plaintiff made no complaints of pain for a two-year period and all doctors treated Plaintiff's pain conservatively.) Plaintiff also received conservative treatment for his neck and low back pain in 2009, and admitted that physical therapy improved his pain. Contrary to his testimony at the hearing that his medication made him tired and he needed to nap twice a day, Plaintiff denied medication side effects to his physicians.

While it is credible that Plaintiff's years of heavy exertional work caused a degree of painful impairments, the relatively minor objective findings and long periods without treatment do not support

the degree of limitation asserted by Plaintiff. Therefore, there is sufficient evidence in the record supporting the ALJ's decision to discount Plaintiff's subjective complaints and give more weight to a nonexamining physician's RFC opinion.

### 3.     Hypothetical Question to the Vocational Expert

The ALJ relied on the VE's response to a hypothetical question that assumed Plaintiff had the impairments and restrictions that the ALJ found supported by the record. Because the Court finds the ALJ's RFC finding is supported by substantial evidence in the record as a whole, the ALJ did not err in relying on the VE's testimony of Plaintiff's ability to perform work as a gate guard, surveillance system monitor and telemarketer. *See Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007) (ALJ properly relied on VE's testimony based on a hypothetical question that contained all impairments supported by the record.) Therefore, the Court recommends affirming the ALJ's decision.

## IV.   RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.     Plaintiff's Motion for Summary Judgment (#15) **be denied.**

2.     Defendant's Motion for Summary Judgment (#21) **be granted;**

4.     The case be **DISMISSED WITH PREJUDICE AND JUDGMENT BE ENTERED.**


DATED:  July 23, 2013

*s/Franklin L. Noel*
FRANKLIN L. NOEL
Unites States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before August 7, 2013, written objections

which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within 14 days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A district court judge shall make a de novo review of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.